**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| FLINT RIVERKEEPER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No.** |
| | ) | |
| CITY OF ATLANTA, GEORGIA, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Flint Riverkeeper, Inc. ("Flint Riverkeeper") files this Complaint against Defendant City of Atlanta ("Atlanta") and alleges as follows:

## STATEMENT OF THE CASE

1. This is a citizen suit under Section 505(a) of the federal Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1), to address Atlanta's longstanding and unlawful discharges of pollutants—including fuel, raw sewage, Escherichia coli ("E. coli") bacteria, trash, and per- and polyfluoroalkyl substances ("PFAS")—from the Hartsfield-Jackson Atlanta International Airport (the "Airport"), which Atlanta owns and operates, into the Flint River and two of its tributaries, Sullivan Creek and Mud Creek. Atlanta's discharges of these pollutants violate the CWA's prohibition on unpermitted discharges and the city's coverage under Georgia's Industrial General Stormwater Permit. These illegal discharges have and continue

to adversely affect water quality and aquatic life downstream of the Airport and have contaminated the Flint River, a critical source of drinking water for more than 400,000 people, with unsafe levels of PFAS.

2. These illegal discharges are due to, among other things, recurring spills of fuel and sewage at the Airport and the Airport's inadequate stormwater infrastructure, which is unable to effectively contain pollutants when it rains.

3. Over the past 5 years, over 400 fuel spills have been documented at the Airport, including at least 9 that resulted in direct discharges to the Flint River and its tributaries from the Airport's stormwater outfalls. In 2026 alone, three major fuel spills occurred, discharging many tens of thousands of gallons of fuel into the Flint River and triggering "Do Not Drink" advisories for downstream communities that withdraw drinking water from the Flint.

4. Spills from Atlanta's sanitary sewers at the Airport have repeatedly contaminated the Flint River and its tributaries with raw sewage and unsafe levels of bacteria. Spills into Sullivan Creek from one sewer system lift station have occurred at least 5 times since 2018, including just 2 months ago, when 33,000 gallons of untreated sewage was discharged into the creek and caused a fish kill.

5. Atlanta's stormwater infrastructure at the Airport also discharges pollutant-laden stormwater directly into the Flint River, Sullivan Creek, and Mud Creek. The Airport has a vast area of impervious surfaces that generate significant

runoff when it rains. Only parts of the Airport are served by "first flush" systems that capture and treat stormwater runoff, and even in covered areas those systems capture only a small amount of initial runoff, while the rest of this polluted runoff discharges directly to the Flint River and its tributaries.

6. This is also a citizen suit under Section 7002(a)(1)(B) of the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), which authorizes citizens to sue those responsible for the handling and disposal of solid and hazardous waste that may endanger health or the environment. Plaintiff seeks to abate the imminent and substantial danger caused by Atlanta's handling and disposal of PFAS at the Airport, which has contaminated downstream public water supplies sourced from the Flint River, including Clayton County and the City of Griffin, with toxic levels of PFAS.

7. Water sampling and testing conducted by Clayton County and Flint Riverkeeper show high levels of PFAS contamination in the Flint River and its tributaries just downstream of the Airport. Importantly, samples taken from just downstream of the Airport have significantly higher levels of PFAS than samples taken from just upstream of the Airport. And even more critically, drinking water utilities that draw from the Flint River downstream of the Airport have PFAS concentrations that exceed federal standards for safe drinking water.

8. Plaintiff files this suit to stop the ongoing pollution of the Flint River and its tributaries caused by Atlanta's unlawful discharges and dangerous disposal of pollutants, including fuel, sewage, E. coli, trash, and PFAS, from the Airport.

9. Plaintiff seeks declaratory relief, injunctive relief, civil penalties, and costs of litigation, including reasonable attorney and expert fees and expenses.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over the CWA claims set forth in this Complaint against Atlanta pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

11. This Court has subject matter jurisdiction over the RCRA claim set forth in this Complaint pursuant to Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and 28 U.S.C. § 1331.

12. Plaintiff has complied with the pre-suit notice provisions of the CWA. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff mailed a notice of intent to file suit ("Notice Letter") under the CWA on July 29, 2026, to Atlanta, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the EPA Region 4 Administrator, the Georgia Environmental Protection Division ("EPD"), and the U.S. Attorney General. The Notice Letter complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More than 60 days have passed since the Notice Letter was served on Atlanta and these agencies.

A true and correct copy of the Notice Letter is attached as Exhibit 1, and documentation of its receipt under the CWA regulations is attached as Exhibit 2.

13. Neither EPA nor EPD has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or State to redress the violations of the CWA by Atlanta. In addition, neither EPA nor EPD has commenced an administrative civil penalty action under Section 309(g)(6) of the Act, 33 U.S.C. § 1319(g)(6), or under a comparable Georgia law, to redress the violations of the CWA by Atlanta. Any administrative action to address these violations taken by EPD would not preempt this CWA citizen suit because Georgia's water pollution enforcement scheme is not comparable to the enforcement provisions of the CWA.

14. Plaintiff has complied with the pre-suit notice provisions of RCRA. Pursuant to Section 7002(b)(1)(A) of RCRA, 42 U.S.C. § 6972(b)(1)(A), on July 29, 2026, Plaintiff mailed the Notice Letter to Atlanta, the EPA Administrator, the EPA Region 4 Administrator, Georgia EPD, and the U.S. Attorney General. The Notice Letter complied with 42 U.S.C. § 6972(b)(1)(A) and 40 C.F.R. § 254.3. More than ninety (90) days have passed since the Notice Letter was served on Atlanta and these agencies. A true and correct copy of this Notice Letter is attached as Exhibit 1, and documentation of its receipt in compliance with the RCRA regulations is attached as Exhibit 3.

15. The EPA has not commenced, nor is it prosecuting, a civil action in a court of the United States under 42 U.S.C. § 6973 or under 42 U.S.C. § 9606 to address the imminent and substantial endangerment to health or the environment detailed in the Notice Letter. EPA has not engaged in a removal action nor incurred costs to initiate a Remedial Investigation and Feasibility Study under 42 U.S.C. § 9604. EPA has not obtained a court order (including a consent decree) or issued an administrative order under 42 U.S.C. § 9606 or 42 U.S.C. § 6973, pursuant to which Atlanta is conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action on the Airport property where Atlanta has handled and disposed of PFAS.

16. Georgia EPD has not commenced, nor is it prosecuting, an action under 42 U.S.C. § 6972(a)(1)(B) to address the imminent and substantial endangerment to health or the environment; nor is Georgia EPD actually engaging in a removal action under 42 U.S.C. § 9604; nor has Georgia EPD incurred costs to initiate a Remedial Investigation and Feasibility Study under 42 U.S.C. § 9604 on the Airport property where Atlanta has handled and disposed of PFAS.

17. Plaintiff will, immediately upon receipt of a file-stamped copy of this Complaint, mail a copy to the Administrator of the EPA, the EPA Region 4 Administrator, and the Attorney General of the United States.

18. Venue is appropriate in the Northern District of Georgia because the sources of the violations alleged under the CWA and RCRA are located within this district. 33 U.S.C. § 1365(c)(1); 42 U.S.C. § 6972(c).

## PARTIES

19. Plaintiff Flint Riverkeeper, Inc. is a non-profit corporation organized under the laws of the State of Georgia, with a principal office in Albany, Georgia. Flint Riverkeeper seeks to restore and preserve the habitat, water quality, and flow of the Flint River for the benefit of current and future generations and dependent wildlife. Flint Riverkeeper achieves these objectives through education, advocacy, monitoring, public engagement, social events, water sampling and testing, pollution prevention measures, and seeking redress in the courts when necessary.

20. Flint Riverkeeper is a membership-based organization representing roughly 1,500 individuals—some of whom own real property and/or reside along the Flint River and its tributaries downstream of the Airport, consume drinking water from the Flint River, and engage in social events and recreational activities including fishing, swimming, and boating in and on the Flint River and its tributaries.

21. Flint Riverkeeper's members have property, economic, aesthetic, recreational, scientific, and health interests in the waters of the Flint River basin downstream of the Airport, and those members have been, and will continue to

be, directly and substantially injured as a direct result of Atlanta's ongoing contamination of the Flint River watershed via illegal discharges of fuel, sewage, E. coli, trash, and PFAS that threaten members' health and safety and diminish members' use and enjoyment of the waters.

22. For instance, Flint Riverkeeper has members who fish and recreate on the Flint River, and who would like to fish and recreate on the Flint in closer proximity to the Airport, but will not due to the ongoing pollution from the Airport.

23. Flint Riverkeeper also has members who rely on, use, and consume water at their homes and businesses from Clayton County's public water supply and from the City of Griffin's public water supply, both of which source their water from the Flint River downstream from the Airport. These members have property, economic, and health interests in these waters and have been, and will continue to be, directly and substantially injured as a direct result of Atlanta's past and ongoing contamination of those public drinking water supplies with fuel and unsafe levels of PFAS from the Airport.

24. Flint Riverkeeper has expended significant organizational resources, including money, supplies, and employee time and effort, to assess and respond to the Airport's pollution of the Flint River and its tributaries. This commitment of resources includes water sampling, lab costs, travel time, and time and effort spent educating members and the public about Airport pollution

events. Flint Riverkeeper has also urged Atlanta to address and abate the ongoing pollution of the Flint River, Sullivan Creek, and Mud Creek for over a decade, to no avail.

25. The relief sought herein will redress the injuries to Flint Riverkeeper and its members caused by Atlanta's contamination of the Flint River, Sullivan Creek, and Mud Creek with fuel, sewage, E. coli, trash, and PFAS in violation of the CWA and RCRA. Their injuries will not be redressed except by an order from this Court requiring Atlanta to take immediate and substantial action to stop this contamination of the Flint River, Sullivan Creek, and Mud Creek and to comply with such other relief as this Court deems necessary. Because these injuries are being caused by pollution of the waters of the United States, the injuries fall within the zone of interests protected by the CWA. Likewise, because these injuries are being caused by Atlanta's handling and disposal of PFAS, the injuries fall within the zone of interests protected by RCRA's imminent and substantial endangerment provision.

26. The interests Flint Riverkeeper seeks to protect in this lawsuit are germane to its goals and objectives, and neither the claims asserted herein, nor any of the relief requested, requires the participation of individual members in this lawsuit. Accordingly, Flint Riverkeeper has standing to pursue this action.

27. Plaintiff Flint Riverkeeper is a "citizen" within the meaning of the CWA, 33 U.S.C. § 1365(a) and (g).

28. Plaintiff Flint Riverkeeper is a "person" within the meaning of RCRA, 42 U.S.C. §§ 6903(15) and 6972(a).

29. Defendant Atlanta is a municipal corporation organized under the laws of the State of Georgia. Atlanta owns and operates the Airport, including but not limited to the Airport's stormwater infrastructure. Atlanta also owns and operates the sanitary sewer infrastructure on Airport property.

30. Defendant Atlanta is a "person" within the meaning of the CWA, 33 U.S.C. §§ 1362(5) and 1365(a)(1).

31. Defendant Atlanta is a "person" within the meaning of RCRA, 42 U.S.C. §§ 6903(15) and 6972(a)(1)(B).

## STATUTORY BACKGROUND

### The Clean Water Act

*The NPDES Permitting Program and Water Quality Standards*

32. The primary objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

33. To achieve this objective, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants by any person from a point source

to waters of the United States, except in compliance with, among other conditions, a National Pollutant Discharge Elimination System ("NPDES") permit issued by the EPA or an authorized state pursuant to Section 402 of the CWA. 33 U.S.C. §§ 1311(a), 1342. Each discharge not authorized by a NPDES permit, and each violation of a NPDES permit, is a violation of the CWA.

34. EPA has delegated to Georgia EPD the authority to administer the state's NPDES permitting program. *See* O.C.G.A. §§ 12-2-24, 12-5-23, 12-5-30.

35. The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A).

36. The term "pollutant" is broadly defined and includes solid waste, sewage, garbage, chemical waste, biological materials, rock, sand, and industrial, municipal, and agricultural waste. *Id.* § 1362(6).

37. The term "point source" includes any "discernible, confined and discrete conveyance" from which pollutants may be discharged, including pipes, ditches, channels, tunnels, conduits, wells, discrete fissures, and containers. *Id.* § 1362(14).

38. The term "navigable waters" is defined as "waters of the United States, including the territorial seas." *Id.* § 1362(7).

39. Section 303(c) of the CWA, 33 U.S.C. § 1313(c), requires states to adopt water quality standards, including narrative criteria and numeric criteria

(risk-based criteria that set site-specific allowable pollutant levels for individual state waterbodies). *See also* 40 C.F.R. § 131.3(b).

40. The purpose of water quality standards is to ensure that water quality provides for the protection and propagation of fish, shellfish, and wildlife, and provides for recreation in and on the water. *See* 33 U.S.C. § 1251(a)(2).

41. States adopt water quality standards based upon "designated uses of the navigable waters involved" and "taking into consideration their use and value for public water supplies, propagation of fish and wildlife, and recreational purposes," among others. *Id.* § 1313(c)(2)(A).

42. If a waterbody is too polluted or otherwise degraded to support its designated use(s), the waterbody is considered "impaired." Every two years, Georgia EPD prepares a list of these impaired waters. *Id.* § 1313(d).

43. Georgia's narrative water quality standards provide that "[a]ll waters shall be free from oil, scum and floating debris associated with municipal or domestic sewage, industrial waste or other discharges in amounts sufficient to be unsightly or to interfere with the designated use of the water body." Ga. Comp. R. & Regs. 391-3-6-.03(5)(b).

44. Georgia's narrative water quality standards also require all waters to "be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere

with the designated use of the water body." Ga. Comp. R. & Regs. 391-3-6-.03(5)(c).

45. For waters with a designated use of fishing, Georgia's water quality standards provide that for the months of May through October, culturable E. coli must not exceed a geometric mean of 126 counts per 100 mL based on at least four samples collected from a given sampling site over a 30-day period at intervals not less than 24 hours. Ga. Comp. R. & Regs. 391-3-6-.03(6)(c)(i)(2).

46. For the months of November through April, the water quality standards state that culturable E. coli in waters with a designated use of fishing shall not exceed a geometric mean of 265 counts per 100 mL based on at least four samples collected from a given sampling site over a 30-day period at intervals not less than 24 hours. Ga. Comp. R. & Regs. 391-3-6-.03(6)(c)(i)(2).

*Georgia's Industrial General Permit for Stormwater Discharges*

47. Georgia EPD has issued NPDES Permit No. GAR05000, known as the Industrial General Permit ("IGP"), to regulate discharges of polluted stormwater associated with industrial activities.

48. Coverage under the IGP is required for airports that generate stormwater discharges from the following industrial activities: air and/or land vehicle maintenance activities (including vehicle rehabilitation, mechanical repairs,

painting, fueling, and lubrication), equipment cleaning operations, or airport deicing operations. IGP, Sector 8.S.1.

49. The IGP authorizes stormwater discharges from *only* those portions of an airport that are involved in vehicle maintenance, equipment cleaning operations, or deicing operations. Any other discharges to waters of the United States must be covered by a separate NPDES permit. IGP, Sector 8.S.2.1.

50. Either a single comprehensive Stormwater Pollution Prevention Plan ("SWPPP") or multiple tenant-based SWPPPs must be developed for stormwater discharges associated with industrial activity at an airport. IGP, Sector 8.S.3.3.

51. A SWPPP documents the selection, design, and installation of best management practices ("BMPs") or other methods used to prevent or reduce the discharge of pollutants to waters of the United States. IGP, Part 5 & App. A.

52. The IGP requires permittees to "keep clean all exposed areas that are potential sources of pollutants" and to "minimize the potential for waste, garbage, and floatable debris to be discharged by keeping exposed areas free of such materials, or by intercepting them before they are discharged." IGP, Part 2.1.2.2.

53. Similarly, the IGP requires permittees to "ensure that waste, garbage, and floatable debris are not discharged to receiving waters by keeping exposed areas free of such materials or by intercepting them before they are discharged." IGP, Part 2.1.2.10.

54. The IGP requires permittees to "divert, infiltrate, reuse, contain, or otherwise reduce stormwater runoff to minimize pollutants in discharges to the maximum extent practicable." IGP, Part 2.1.2.7.

55. Under the IGP, stormwater discharges "must be controlled as necessary to ensure that the receiving waterbody does not exceed the applicable Water Quality Standards as stated in the Georgia Rules and Regulations for Water Quality Control 391-3-6-.03." IGP, Part 2.3.1.1.

56. If "an unauthorized release or discharge (e.g., spill, leak, or discharge of non-stormwater not authorized by [the IGP] or another NPDES permit) occurs at" the airport, the permittee "must review and revise the selection, design, installation, and implementation of control measures to eliminate the condition and ensure that it will not be repeated in the future." IGP, Part 3.1.a.

*Citizen Enforcement of the Clean Water Act*

57. Section 505(a) of the CWA, 33 U.S.C. § 1365(a), authorizes "any citizen" to commence a civil action for appropriate relief, including declaratory and injunctive relief and civil penalties, whenever any person is in violation of Section 301 of the Act, 33 U.S.C. § 1311, or violates any limitation or condition in an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

58. Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates Section 301 of the Act, 33 U.S.C. § 1311, or violates any

limitation or condition in an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342, shall be subject to a civil penalty not to exceed $68,445 per day for each violation which takes place after November 2, 2015. *See* 40 C.F.R. §§ 19.1–19.4 (updating statutory penalties to adjust for inflation).

59. Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees and expenses.

**The Resource Conservation and Recovery Act**

60. RCRA is a comprehensive environmental statute whose purpose is to reduce or eliminate the generation of solid waste and hazardous waste, and it recognizes that waste "that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b).

61. The term "solid waste" is broadly defined and includes garbage, refuse, sewage sludge, "and other discarded material." *Id.* § 6903(27).

62. RCRA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *Id.* § 6903(3).

63. Exposure to drinking water contaminated with pollutants that exceed maximum contaminant levels set by EPA is highly probative—if not conclusive—evidence of imminent and substantial endangerment.

*Citizen Enforcement of RCRA*

64. Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), authorizes any person to sue those responsible for the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste "which may present an imminent and substantial endangerment to health or the environment."

65. Section 7002(e) of RCRA, 42 U.S.C. § 6972(e), authorizes the Court to "award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the Court determines such an award is appropriate."

## FACTUAL ALLEGATIONS

### The Upper Flint River Watershed

66. The Flint River's headwaters trickle up from springs in East Point, Hapeville, and College Park just north of the Airport. The river begins flowing in earnest from the mouth of a concrete culvert on the south side of Virginia Avenue in Hapeville and runs south, directly underneath the Airport's runways and terminal complex through a large concrete tunnel. It flows out of the Airport

property and continues its path south, through Clayton County, Fayette County, and beyond to its confluence with the Chattahoochee River at Lake Seminole.

67. Sullivan Creek is a tributary of the Flint River that emerges from springs to the west of the Airport. Sullivan Creek flows east towards the Airport, then flows through and beneath southwestern portions of the Airport property until it eventually converges with the Flint River just a few miles south of the Airport.

68. Mud Creek is also a tributary of the Flint River. Mud Creek flows along the eastern boundary of the Airport and continues flowing south until its confluence with the Flint River, not far downstream of Sullivan Creek's confluence with the Flint River.

69. The right side of the following image shows an aerial view of the Airport, the Flint River, Sullivan Creek, and Mud Creek, and the left side of the image shows the location of drinking water intakes on the Flint River downstream of the Airport:

**The Atlanta Airport and the Flint River watershed**




70. The Flint River provides drinking water to more than 400,000 people downstream of the Airport, including people living in Clayton County and the City of Griffin.

71. The entire Flint River basin provides water for drinking, swimming, and fishing, and commercial, industrial, and agricultural pursuits for more than one million people.

72. According to Georgia EPD, the segment of the Flint River upstream of the Airport is meeting water quality standards and is supporting its designated use of fishing, and it has supported that designated use since approximately 2002.

73. The segment of the Flint River as it exits the Airport and flows down to Highway 138, however, is impaired and is not supporting its designated use of fishing. That segment of the river has been impaired due to bacteria pollution since at least 2000, due to impacts on benthic macroinvertebrates since 2006, and due to copper pollution since 2016.

74. The segment of Sullivan Creek that flows from its headwaters upstream of the Airport over to I-285 on the south side of the Airport has met water quality standards for bacteria since approximately 2008.

75. In contrast, the segment of Sullivan Creek that flows from I-285 on the south side of the Airport down to its confluence with the Flint River has been impaired due to bacteria since approximately 2008.

76. Mud Creek, from its headwaters to the east of the Airport down to its confluence with the Flint River, has been impaired due to bacteria pollution since at least 2000.

77. The following figure, which is in Atlanta's SWPPP for the Airport, shows the impaired segments of the Flint River, Sullivan Creek, and Mud Creek in pink and the segments that are meeting water quality standards in dark blue:




**Hartsfield-Jackson Atlanta International Airport**

78. The Airport is located near College Park, Georgia, in Fulton and Clayton Counties, and is almost entirely within the Flint River watershed.

79. The City of Atlanta owns the Airport and operates it through the city's Department of Aviation, which oversees daily operations at the Airport.

80. According to the Airport's website, the terminal complex measures approximately 7.7 million square feet, or 176 acres. The complex includes the domestic terminal building and concourses T, A, B, C, and D, and the international terminal building and concourses E and F. Within these concourses, there are 155 domestic and 43 international gates.

81. The entire Airport property occupies approximately 4,700 acres, and more than 60 percent of that acreage is covered by impervious surfaces.

82. Atlanta owns, manages, operates, or otherwise exercises control over the various facilities and/or activities at the Airport that generate pollutants that may be discharged to the Flint River, Sullivan Creek, and Mud Creek, including but not limited to fueling infrastructure, vehicle maintenance areas, equipment cleaning operations, fire stations, deicing chemicals storage and application facilities, sanitary sewer systems, and a fire training center.

83. Because roughly 60 percent of the Airport's 4,700-acre footprint is covered by impervious surfaces, the Airport generates a significant amount of stormwater runoff containing pollutants during precipitation events.

84. The Airport has infrastructure designed to funnel stormwater during precipitation events into the Flint River, Sullivan Creek, and Mud Creek. That infrastructure includes stormwater piping, culverts, holding tanks, drainage basins, and outfalls.

85. There are over 30 known outfalls where stormwater exits the Airport's piping. Stormwater enters the Flint River from outfalls as it flows beneath the Airport, and river water combined with stormwater emerges on the south side of the Airport.

86. Stormwater from the Airport is also discharged to Sullivan Creek to the southwest of the Airport and Mud Creek to the east via the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls.

87. Atlanta asserts that the Airport can contain stormwater that falls on certain portions of its property from any precipitation event that includes 0.03 inches of precipitation per hour using several "first flush" systems. The Airport's "first flush" systems cover most of the terminal complex, fuel farms, and cargo facilities. These systems route initial stormwater runoff to Atlanta's South River Water Reclamation Center for treatment.

88. Precipitation exceeding 0.03 inches per hour at the Airport's areas covered by "first flush" systems produces direct discharges into the Flint River, Sullivan Creek, and Mud Creek without treatment.

89. At those areas of the Airport not covered by a "first flush" system, any precipitation event that is sufficient to generate stormwater discharges produces direct discharges into the Flint and its tributaries without treatment.

90. Atlanta's discharges of stormwater associated with industrial activities at the Airport are governed by the terms and conditions of the IGP, Permit No. GAR05000. Only those portions of the Airport that are involved in Atlanta's vehicle maintenance, equipment cleaning operations, or deicing operations are covered by the IGP.

91. In accordance with the IGP, Atlanta has a SWPPP for the Airport, which was last revised in 2026.

92. The other operators at the Airport that are required to have coverage under the IGP have their own individual tenant-based SWPPPs. Atlanta and the other operators did not prepare a single comprehensive SWPPP for their current coverage under the IGP. Nevertheless, Atlanta utilizes a "comprehensive approach" to coordinating the management of stormwater discharges "associated with the entirety of Tenants and industrial activities" at the Airport. Atlanta also collects quarterly visual samples and annual samples on behalf of all co-located tenants at the Airport under the requirements of the IGP.

**Atlanta's Ongoing Fuel Spills at the Airport**

93. For years, Atlanta has repeatedly discharged fuel into the Flint River and two of its tributaries, Sullivan Creek and Mud Creek, via its stormwater piping, culverts, holding tanks, drainage basins, and outfalls at the Airport resulting from unpermitted spill events.

94. According to Atlanta's own records, over *400* fuel spills, both large and small, have occurred at the Airport since July 2021. Many of these fuel spills reached storm drains or other stormwater infrastructure and discharged fuel into the Flint River.

95. Specifically, at least nine fuel spills resulted in discharges to surface waters between July 2021 and the present, with at least three separate major fuel spills in 2026 alone.

96. The first spill in 2026, which lasted from late January to early February 2026, went undetected for 8 days as approximately 28,000 gallons of fuel discharged from the Airport's stormwater piping and outfalls directly into the Flint River. The spill was so severe that it triggered "Do Not Drink" advisories in downstream communities like the City of Griffin, where residents reported smelling fuel in their tap water. Other downstream water utilities avoided drawing from the Flint River during that time.

97. The second spill occurred on or around April 22, 2026, when an unknown quantity of a petroleum-based product exited the Airport property where the Flint River emerges from underneath the Airport's runways. That spill is still under investigation by Georgia EPD. Nevertheless, upon information and belief, the petroleum-based product was fuel, it originated on Airport property, and it discharged into the Flint River via the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls.

98. The third spill this year is also still under investigation, but reports estimate that 26,500 gallons of fuel spilled from an underground fuel line and into the Flint River via the Airport's stormwater piping, culverts, holding tanks,

drainage basins, and outfalls over the course of Memorial Day weekend in May 2026.

99. The six other discharges of fuel into the Flint River that have been documented and reported to Georgia EPD since July 2021 include a 1,674-gallon spill on September 26, 2021, which caused a fish kill for over two miles downstream; a 400–500-gallon spill on March 17, 2022; a three-gallon spill on July 6, 2024; a 20-gallon spill on June 11, 2025; and back-to-back spills of three and two gallons on March 15 and 16, 2026.

100. Airport records going back to July 2021 also note instances in which fuel had entered storm drains but records are unclear as to whether fuel was discharged to the Flint River. Those records reflect a less than 5-gallon spill on June 3, 2022; a 50-gallon spill on June 13, 2023; a 1,245-gallon spill on November 13, 2023; a 25-gallon spill on March 4, 2024; a 50-gallon spill on April 18, 2024; a 10-gallon spill on April 22, 2025; an unknown quantity spill on May 5, 2025; and a 10-gallon spill on June 12, 2025. Upon information and belief, fuel from some if not all of those spills discharged to the Flint River either shortly after the spill event or during the next precipitation event.

101. Atlanta has not taken meaningful steps to prevent the ongoing discharge of fuel by spills into the Flint River and its tributaries from the Airport's

stormwater piping, culverts, holding tanks, drainage basins, and outfalls, and thus these fuel spills are likely to recur.

**Atlanta's Ongoing Sewage Spills at the Airport**

102. At least four times in the last five years, Atlanta's sewer infrastructure on Airport premises has failed, spilling thousands of gallons of raw sewage into waters of the United States.

103. Two of these spills occurred at the approximate coordinates 33.63833 N, 84.40833 W, which is the location of a sanitary sewer pipe.

104. On November 30, 2021, the above-referenced sanitary sewer pipe failed, causing 6,000 gallons to spill to the surface, about 1,500 gallons of which entered one of the Airport's storm drains and subsequently discharged to Mud Creek via a stormwater outfall.

105. On January 20, 2022, the same sewer pipe failed, causing 2,100 gallons to spill and be discharged to Mud Creek via an Airport's storm drain and outfall.

106. The other two sewage spills into waters of the United States within the past 5 years occurred at approximate coordinates 33.6181642 N, 84.4417254 W, identified on maps within Airport records as Lift Station No. 2, which is located directly next to Sullivan Creek on the south side of the Airport.

107. On January 30, 2023, equipment at Lift Station No. 2 failed, resulting in 22,000 gallons of raw sewage discharging from an aboveground bypass line and/or other discrete conveyances into Sullivan Creek. Airport records show that bacteria levels remained elevated downstream of Lift Station No. 2 for weeks after the spill.

108. On or around September 16, 2026, a 33,000-gallon sewage spill at Lift Station No. 2 from discrete conveyances into Sullivan Creek caused a fish kill with hundreds of fatalities and E. coli levels above Plaintiff's laboratory quantification limits. In other words, E. coli levels were too numerous to count but were likely well above 4,500 counts per 100 mL based on Plaintiff's lab equipment and methodology.

109. Spills from Lift Station No. 2 have happened repeatedly and are likely to recur in the future. In addition to the spills in January 2023 and September 2026 referenced above, major spills at Lift Station No. 2 also occurred in June 2015, July 2018, and February 2019, resulting in roughly 100,000 gallons of raw sewage discharging directly into Sullivan Creek. According to the Airport's records, inspectors responding to the February 2019 spill found the Lift Station's piping in seriously poor condition, creating a reasonable likelihood of subsequent spills.

110. Atlanta has also reported instances in which raw sewage spilled from other locations on Airport property and entered storm drains but no evidence of

surface water impacts was observed. Those events include a 1-gallon spill on January 27, 2022; a 50-gallon spill on October 12, 2023; an unknown-quantity spill on June 4, 2024; a 75-gallon spill on September 29, 2025; and a 150-gallon spill on January 12, 2026. Upon information and belief, some if not all sewage from those spills discharged to the Flint River, Sullivan Creek, or Mud Creek shortly after the spills or during the next precipitation event.

111. Atlanta has not taken meaningful steps to prevent sewer spills into the Flint River, Sullivan Creek, and/or Mud Creek from recurring, nor has it taken meaningful steps to prevent sewer spills from entering its stormwater piping, culverts, holding tanks, drainage basins, and outfalls and subsequent discharge to the Flint River, Sullivan Creek, and/or Mud Creek. Thus, sewage spills are ongoing and/or likely to recur.

**Atlanta's Unpermitted Stormwater Discharges of E. coli, Sewage, and Trash**

112. Every time it rains at the Airport in amounts sufficient to generate stormwater discharges, including but not limited to the dates listed on Exhibit B of the Notice Letter attached hereto and incorporated by reference herein, Atlanta discharges stormwater containing various pollutants including E. coli, sewage, and trash into the Flint River, Sullivan Creek, and Mud Creek.

113. At the Airport's areas not covered by a "first flush" system, this precipitation results in direct discharges of contaminated stormwater into the Flint River, Sullivan Creek, and Mud Creek without treatment.

114. At the Airport's areas covered by a "first flush" system, precipitation exceeding 0.03 inches per hour produces direct discharges of contaminated stormwater from the Airport's stormwater infrastructure into the Flint and its two tributaries without treatment.

115. Specifically, whenever it rains in sufficient amounts to generate stormwater discharges, Atlanta discharges E. coli to the Flint River, Sullivan Creek, and Mud Creek from its stormwater piping, culverts, holding tanks, drainage basins, and outfalls.

116. For instance, on June 19, 2026, during a rain event, samples taken from the Flint River at two locations upstream of the Airport had E. coli levels of 700 and 1,664 counts per 100 mL, respectively. In samples collected just downstream of the Airport, however, E. coli levels were reported as "too numerous to count," which is more than 4,500 counts per 100 mL.

117. Upon information and belief, raw sewage, itself a source of E. coli, also enters the Flint River and its tributaries during these precipitation events by a process known as "inflow" or "infiltration," whereby precipitation enters the sewer

system via cracks, fissures, broken connections, and other defects in the infrastructure causing releases of sewage.

118. According to maps of the stormwater and sewer infrastructure underneath the Airport's surface, the sewer pipes and stormwater pipes are laid in very close proximity to each other, often running along the same path.

119. Raw sewage that flows out of the Airport's sewer piping then enters the Airport's stormwater piping and subsequently discharges into the Flint River and its tributaries.

120. Flint Riverkeeper staff and members frequently smell sewage in the Flint River and Sullivan Creek just downstream of the Airport, including on days when there were no reported spills of sewage at the Airport.

121. As previously alleged, segments of the Flint River and Sullivan Creek where they exit Airport property to the south are impaired for bacteria (E. coli), and Mud Creek from its headwaters east of the Airport to its confluence with the Flint is also impaired for bacteria, providing further evidence of Atlanta's ongoing discharges of E. coli and sewage into these surface waters.

122. Atlanta's discharges of E. coli and raw sewage are ongoing and likely to recur.

123. The Airport also generates an enormous quantity of solid waste during its ordinary operations. This waste includes ordinary trash from passengers such as

food and beverage packaging but also Airport-specific trash like luggage tags and earplugs worn by personnel who work on the tarmac. Aside from consumer products, the waste generated by the Airport also includes discarded materials from construction operations, which are perpetually ongoing at the Airport.

124. The Airport discharges much of this solid waste into the Flint River and its tributaries during precipitation events, when it flows through the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls unabated.

125. Airport trash is readily identifiable in the Flint River downstream of the Airport.

126. Flint Riverkeeper staff and members have observed luggage tags and earplugs in the Flint River where it daylights on Airport property, at the approximate coordinates 33.62441 N, 84.41417 W, during volunteer trash cleanup events hosted by Airport sustainability officials on November 11, 2021; April 22, 2022; November 5, 2022; October 28, 2023; April 19, 2024; October 18, 2024; April 18, 2025; and October 31, 2025.

127. Shortly downstream of Airport property at Forest Parkway, Riverkeeper staff regularly observe Airport-generated trash in the Flint River. Riverkeeper staff have observed trash on at least the following dates: May 20, 2022; November 11, 2023; May 30, 2024; November 10, 2025; February 10, 2026;

March 4, 2026; March 6, 2026; March 31, 2026; April 21, 2026; May 25, 2026; May 28, 2026; and June 19, 2026.

128. These discharges of trash and other solid waste are ongoing and likely to recur.

**Atlanta's Disposal and Discharges of PFAS at the Airport**

129. PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable and repel both oil and water and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial and commercial applications.

130. PFAS do not biodegrade, and there is no known environmental breakdown mechanism for many of these chemicals, so they remain in the environment indefinitely.

131. PFAS are readily absorbed into biota and tend to bioaccumulate in fish and wildlife with repeated exposure, resulting in developmental and reproductive impacts, behavioral changes, adverse effects on livers, disruption to endocrine systems, and weakened immune systems, among other impacts.

132. PFAS are highly mobile and leach from soil to groundwater, making groundwater and surface water particularly vulnerable to contamination.

133. A major source of human exposure to PFAS is through ingestion of contaminated drinking water. When ingested, these chemicals build up in the human body and have been known to cause negative developmental impacts on fetuses and infants, kidney and testicular cancer, liver malfunction, hypothyroidism, high cholesterol, ulcerative colitis, obesity, decreased immune response to vaccines, reduced hormone levels, delayed puberty, and lower birth weight and size.

134. Given these harms, EPA promulgated national drinking water standards for six PFAS compounds on April 10, 2024. EPA set a maximum contaminant level in drinking water for two of the most widespread and longest-used PFAS—perfluorooctanoic acid (“PFOA”) and perfluorooctane sulfonate (“PFOS”)—to 4 parts per trillion (ppt).

135. EPA also established a maximum contaminant level “goal” for PFOA and PFOS of 0 ppt, recognizing that no level of PFOA or PFOS in drinking water is safe.

136. EPA also established a maximum contaminant level of 10 ppt for PFHxS, PFNA, and HFPO-DA (commonly known as GenX), and a Hazard Index maximum contaminant level for mixtures of certain types of PFAS.

137. For at least 40 years, Atlanta has handled products containing various PFAS for a wide range of activities at the Airport at a wide range of locations on Airport property.

138. Atlanta has also disposed of PFAS on both permeable and impervious surfaces at the Airport.

139. As a result of Atlanta's handling and disposal of PFAS at the Airport, PFAS have been and are being discharged to the Flint River, Sullivan Creek, and Mud Creek via the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls and via hydrologically connected soils and groundwater beneath the Airport.

140. Surface water sampling conducted by the Clayton County Water Authority on March 30, 2022; June 28, 2022; September 28, 2022; January 4, 2023; March 29, 2023; June 27, 2023; September 25, 2023; December 29, 2023; April 3, 2024; June 20, 2024; September 20, 2024; December 11, 2024; March 25, 2025; June 16, 2025; September 24, 2025; December 17, 2025; March 17, 2026; June 15–16, 2026; and September 24, 2026 show the persistent presence of PFAS in the Flint River downstream of the Airport at concentrations significantly higher than those upstream of the Airport.

141. Specifically, Clayton County Water Authority's sampling data show increased concentrations of the following PFAS compounds in the Flint River and

its two tributaries just downstream of the Airport: PFOA, PFOS, PFHxS, PFNA, PFBS, PFHpA, PFHxA, PFBA, PFPeA, PFPeS, PFHpS, PFUnA, and 6:2 FTS.

142. Over the span of 13 sampling events between 2023 and 2026 conducted by the Clayton County Water Authority, the average concentration of PFOA on the Flint River at International Boulevard, just upstream of the Airport, was 7.43 ppt; on the Flint River at Terrell Mill Road, just downstream of the Airport, the average concentration was 41.55 ppt.

143. The trend for PFOS is similar: over the same time span, average PFOS concentrations were 7.78 ppt in the Flint River upstream of the Airport but 55 ppt immediately downstream.

144. For PFHxS, the Flint River upstream of the Airport consistently meets the maximum contaminant level of 10 ppt but exceeds that threshold immediately downstream of the Airport. Average PFHxS concentrations spike from 3.30 ppt in the Flint upstream of the Airport to 116.30 ppt downstream of the Airport, and PFHxS concentrations have been as high as 210 ppt in downstream samples.

145. Average PFNA levels spike from 0.14 ppt in the Flint River upstream of the Airport to 12.16 ppt downstream of the Airport.

146. Sampling conducted on August 4, 2026, on behalf of Plaintiff also reveals much higher concentrations of PFAS compounds immediately downstream of the Airport. PFOS and PFOA in the Flint River spiked from roughly 11 ppt to

53.4 ppt and 72.9 ppt, respectively; PFNA was not detected upstream of the Airport, while its concentration was 22.5 ppt downstream; PFHxS skyrocketed from 5.28 ppt to 175 ppt. On Sullivan Creek, PFOA levels more than tripled from below 10 ppt upstream of the Airport to 32.3 ppt downstream, while PFOS levels increased tenfold from 17.7 ppt to 179 ppt. PFHxS in Sullivan Creek also jumped more than tenfold, from 18.1 ppt to 192 ppt.

147. Sampling conducted on September 17, 2026, a dry-weather day, further demonstrates that PFAS originates at and is discharged from the Airport. Not only do water quality samples show elevated levels of PFAS downstream of the Airport as compared to upstream, but a sample taken directly from one of the Airport's stormwater outfalls (labeled "SC01" in Exhibit A of the Notice Letter), detected extraordinarily high levels of PFAS, including PFOA at 167 ppt and PFOS and PFHxS concentrations of over 1,200 ppt each. Meanwhile, a sample taken just *twenty feet* upstream, before the Airport's outfall into Sullivan Creek, contained PFOA at only 6.86 ppt and PFOS and PFHxS around 10 ppt.

148. Samples taken from Mud Creek downstream of the Airport on August 4 and September 17, 2026, also reflect PFAS concentrations exceeding maximum contaminant levels, with PFHxS readings, for instance, of 61.3 ppt and 92.2 ppt.

149. Sampling data demonstrate that the Airport is the source of various PFAS compounds, including PFOA, PFOS, PFNA, PFHxS, and several others,

which degrade water quality in the Flint River, Sullivan Creek, and Mud Creek, and threaten downstream drinking water supplies.

150. Atlanta has discharged PFAS on at least the dates identified in Paragraphs 140, 146, and 147 above and in Exhibit B of the Notice Letter, and these discharges of PFAS from the Airport are ongoing and likely to recur.

151. Clayton County gets drinking water from the Flint River approximately 20 miles downstream of the Airport. According to data collected pursuant to EPA's fifth Unregulated Contaminant Monitoring Rule ("UCMR 5"), Clayton County's public drinking water supply is contaminated with PFAS and has concentrations of PFOA and PFOS that exceed maximum contaminant levels for these PFAS compounds.

152. The City of Griffin also gets drinking water from the Flint River approximately 60 miles downstream of the Airport. According to data collected pursuant to UCMR 5, Griffin's public drinking water supply is contaminated with PFAS and has concentrations of PFOA and PFOS that exceed maximum contaminant levels for these PFAS compounds.

# CLAIMS FOR RELIEF

## COUNT ONE: Atlanta's Discharges of Pollutants to Surface Waters via Spills without an NPDES Permit in Violation of the Clean Water Act

153. Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in the preceding Paragraphs as though fully set forth herein.

154. The fuel and raw sewage that Atlanta discharges into the Flint River and its tributaries from the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls as a result of spills are "pollutants" under the CWA.

155. Atlanta's stormwater piping, culverts, holding tanks, drainage basins, and outfalls at the Airport are "point sources" under the CWA.

156. Atlanta's sanitary sewer pipes, aboveground bypass lines, and other discrete conveyances discharging sewage at the Airport are "point sources" under the CWA.

157. The Flint River, and its tributaries Sullivan Creek and Mud Creek, are "waters of the United States."

158. Atlanta does not have an NPDES permit authorizing spills of fuel and raw sewage from the Airport into the Flint River, Sullivan Creek, or Mud Creek.

159. Atlanta's spills and resulting discharges of fuel into the Flint River, Sullivan Creek, and/or Mud Creek via stormwater piping, culverts, holding tanks, drainage basins, and outfalls at the Airport on numerous dates within the past five years, including but not limited to the dates listed in Paragraphs 96 through 100

above, without an NDPES permit, are violations of Sections 301 and 402 of the CWA.

160. Atlanta's spills and resulting discharges of raw sewage into the Flint River, Sullivan Creek, and/or Mud Creek via sanitary sewer pipes, aboveground bypass lines, and other discrete conveyances at the Airport on numerous dates within the past five years, including but not limited to the dates listed in Paragraphs 104 through 108 and Paragraph 110 above and in Exhibit B of the Notice Letter, without an NDPES permit, are violations of Sections 301 and 402 of the CWA.

161. These spills and resulting unpermitted discharges alleged herein are continuous or intermittent and are likely to recur.

162. These violations of the CWA have injured and continue to injure the aesthetic, recreational, health, and economic interests of the members of Plaintiff.

163. Plaintiff is entitled to an award of civil penalties against Atlanta, pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), for each day on which illegal and unpermitted non-stormwater discharges have occurred or will occur after the date of this Complaint.

164. Plaintiff is entitled to a permanent injunction, pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), ordering Atlanta to immediately take all necessary steps to come into permanent, consistent compliance with the CWA.

165. Such an injunction would likely redress the aesthetic, recreational, health, and economic injuries of Plaintiff Flint Riverkeeper and its members.

**COUNT TWO: Atlanta's Discharges of Pollutants to Surface Waters without an NPDES Permit in Violation of the Clean Water Act**

166. Plaintiff repeats, re-alleges, incorporates by reference the allegations set forth in the preceding Paragraphs as though fully set forth herein.

167. Anytime it rains in sufficient amounts to generate stormwater discharges—greater than 0.03 inches per hour for those areas containing a first-flush system—Atlanta discharges E. coli, sewage, trash, and PFAS into the Flint River, Sullivan Creek, and Mud Creek via the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls.

168. The E. coli, sewage, trash, and PFAS that Atlanta discharges from the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls during and after precipitation events into the Flint River, Sullivan Creek, and Mud Creek are "pollutants" under the CWA.

169. Atlanta does not have an NPDES permit authorizing stormwater-related discharges of E. coli, sewage, trash, or PFAS into the Flint River, Sullivan Creek, and/or Mud Creek from the Airport.

170. Atlanta's stormwater discharges of E. coli into the Flint River, Sullivan Creek, and Mud Creek via the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls on numerous dates within the past five

years, including but not limited to the dates listed in Paragraph 116 above and in Exhibit B of the Notice Letter, without an NDPES permit, are violations of Sections 301 and 402 of the CWA.

171. Atlanta's stormwater discharges of raw sewage into the Flint River, Sullivan Creek, and Mud Creek from the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls as a result of inflow and infiltration, on numerous dates within the past five years, including but not limited to the dates listed in the Notice Letter, without an NDPES permit, are violations of Sections 301 and 402 of the CWA.

172. Atlanta's stormwater discharges of trash into the Flint River, Sullivan Creek, and Mud Creek from the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls on numerous dates within the past five years, including but not limited to the dates listed in Paragraphs 126 and 127 above and in Exhibit B of the Notice Letter, without an NDPES permit, are violations of Sections 301 and 402 of the CWA.

173. Atlanta's stormwater discharges of PFAS into the Flint River, Sullivan Creek, and Mud Creek from the Airport's stormwater piping, culverts, holding tanks, drainage basins, and outfalls on numerous dates within the past five years, including but not limited to the dates listed in Paragraphs 140, 146, and 147 above

and in Exhibit B of the Notice Letter, without an NDPES permit, are violations of Sections 301 and 402 of the CWA.

174. All of the unpermitted, polluted stormwater discharges alleged above are ongoing or intermittent and are likely to recur.

175. Atlanta's ongoing discharges of E. coli and sewage are contributing to the impairment of those segments of the Flint River, Sullivan Creek, and Mud Creek downstream of the Airport for bacteria. In addition, Atlanta's ongoing discharges of E. coli, sewage, trash, and PFAS are contributing to the impairment of the Flint River downstream of the Airport for benthic macroinvertebrates.

176. These violations of the CWA have injured and continue to injure the aesthetic, recreational, health, and economic interests of Plaintiff Flint Riverkeeper and its members.

177. Plaintiff is entitled to an award of federal civil penalties against Atlanta, pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), for each day on which illegal and unpermitted polluted stormwater discharges have occurred or will occur after the date of this Complaint.

178. Plaintiff is entitled to a permanent injunction, pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), ordering Atlanta to immediately take all necessary steps to come into permanent, consistent compliance with the CWA.

179. Such an injunction would likely redress the aesthetic, recreational, health, and economic injuries of Plaintiff Flint Riverkeeper and its members.

**COUNT THREE: Atlanta's Violations of the Industrial General Permit for Stormwater Discharges and the Clean Water Act**

180. Plaintiff repeats, re-alleges, and incorporates by reference the allegations set forth in the preceding Paragraphs as though fully set forth herein.

181. Atlanta discharges trash from the Airport into the Flint River, Sullivan Creek, and Mud Creek whenever precipitation falls in quantities sufficient to generate stormwater discharges, including on the dates listed in Exhibit B of the Notice Letter.

182. Thus, Atlanta is in violation of Part 2.1.2.2(d) of the IGP by failing to minimize the potential for waste, garbage, and floatable debris to be discharged by keeping exposed areas free of such materials, or intercepting them before they are discharged.

183. Similarly, Atlanta is in violation of Part 2.1.2.10 of the IGP by failing to ensure that waste, garbage, and floatable debris are not discharged to receiving waters by keeping exposed areas free of such materials or by intercepting them before they are discharged.

184. Atlanta is also in violation of Part 2.3.1 of the IGP by failing to control stormwater discharges as necessary to ensure that the receiving waterbody does not exceed Georgia's water quality standards.

185. In particular, Atlanta is failing to control stormwater discharges of trash, fuel, E. coli, sewage, and PFAS as necessary to ensure that the Flint River, Sullivan Creek, and Mud Creek are meeting Georgia's narrative water quality standard requiring all waters "shall be free from oil, scum, and floating debris associated with municipal or domestic sewage, industrial waste or other discharges in amounts sufficient to be unsightly or to interfere with the designated use of the water body." Ga. Comp. R. & Regs. 391-3-6-.03(5)(b).

186. Atlanta is also failing to control stormwater discharges of trash, fuel, E. coli, sewage, and PFAS as necessary to ensure that the Flint River and its tributaries are meeting the narrative water quality standard requiring all waters "shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere with the designated use the water body." Ga. Comp. R. & Regs. 391-3-6-.03(5)(c).

187. Atlanta's recurring stormwater discharges of fuel, trash, E. coli, sewage, and PFAS from the Airport create unsightly conditions in the Flint River, Sullivan Creek, and Mud Creek and produce color, odor, and other objectionable conditions that interfere with the waterbodies' designated uses of fishing.

188. Atlanta is also violating the IGP by failing to "review and revise the selection, design, installation, and implementation of control measures to eliminate

[an unauthorized release or discharge] and ensure that it will not be repeated in the future." IGP, Part 3.1.a.

189. Namely, Atlanta has not reviewed and revised the selection, design, installation and implementation of control measures to ensure that unauthorized releases of fuel, E. coli, sewage, trash, and PFAS will not be repeated in the future.

190. Each of these violations of the IGP are continuous or intermittent and are likely to recur.

191. Atlanta's violations of the IGP on numerous dates over the past five years, including but not limited to the dates listed in Exhibit B of the Notice Letter and the dates listed in Paragraphs 96 through 100, 104 through 108, 110, 116, 126, 127, 140, 146, and 147, are violations of Sections 301 and 402 of the CWA.

192. These violations of the CWA have injured and continue to injure the aesthetic, recreational, health, and economic interests of Plaintiff Flint Riverkeeper and its members.

193. Plaintiff is entitled to an award of federal civil penalties against Atlanta, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), for each day on which illegal violations of the IGP have occurred or will occur after the date of this Complaint.

194. Plaintiff is entitled to a permanent injunction, pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), ordering Atlanta to immediately take all necessary steps to cease its violations of the IGP and the CWA.

195. Such an injunction would likely redress the aesthetic, recreational, health, and economic injuries of Plaintiff Flint Riverkeeper and its members.

**COUNT FOUR: Atlanta's Violation of the Resource Conservation and Recovery Act**

196. Plaintiff repeats, re-alleges, and incorporates by reference the allegations set forth in the preceding Paragraphs as though fully set forth herein.

197. Atlanta is a "person" who has contributed or who is contributing to the past and present handling and disposal of solid waste which "may present an imminent and substantial endangerment to health or the environment," pursuant to 42 U.S.C. § 6972(a)(1)(B).

198. The PFAS discharged into the Flint River, Sullivan Creek, and Mud Creek and the discarded materials containing PFAS compounds at the Airport are "solid waste" as defined by 42 U.S.C. § 6903(27).

199. Atlanta "disposes" of PFAS and materials containing PFAS as defined by 42 U.S.C. § 6903(3).

200. Every sample reported by Clayton County Water Authority taken between 2021 and the date of this Complaint that tested for PFAS in the Flint River upstream and downstream of the Airport found significantly higher PFAS

concentrations in the river just downstream of the Airport compared to PFAS concentrations in the river upstream of the Airport.

201. Every sample collected by consultants for Flint Riverkeeper in August and September 2026 that tested for PFAS in the Flint River upstream and downstream of the Airport found significantly higher PFAS concentrations in the river just downstream of the Airport compared to PFAS concentrations in the river upstream of the Airport.

202. Many of the samples taken between 2021 and the date of this filing show concentrations of PFOS and PFOA well above their maximum contaminant levels of 4 ppt downstream of the Airport, and concentrations of PFHxS and PFNA well above their maximum contaminant levels of 10 ppt.

203. Clayton County's and the City of Griffin's public water supplies, which are sourced with water drawn from the Flint River downstream of the Airport, are contaminated with concentrations of PFOA and PFOS that exceed the maximum contaminant levels of 4 ppt for those chemicals.

204. Atlanta's handling and disposal of PFAS and materials containing PFAS have contributed to the contamination of Clayton County's and the City of Griffin's public water supplies.

205. Atlanta's handling and disposal of PFAS and materials containing PFAS may present an imminent and substantial endangerment to human health and

the environment, including to Plaintiff's members who consume or have consumed water from Clayton County's and the City of Griffin's public water supplies and to aquatic species living in the Flint River, Sullivan Creek, and Mud Creek.

206. Plaintiff is entitled to a permanent injunction ordering Atlanta to cease PFAS releases and discharges into the Flint River, Sullivan Creek, and Mud Creek.

207. Such an injunction would likely redress the health, recreational, and economic injuries of Plaintiff Flint Riverkeeper and its members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(A) Enter a declaratory judgment that Defendant Atlanta has violated and is in violation of the CWA, 33 U.S.C. §§ 1311, 1342;

(B) Enter an enforcement order or an injunction under the CWA ordering Defendant Atlanta to cease and abate discharges of fuel and raw sewage caused by spills into the Flint River, Sullivan Creek, and Mud Creek without an NPDES permit;

(C) Enter an enforcement order or an injunction under the CWA ordering Defendant Atlanta to cease and abate the stormwater discharges of E. coli, sewage, trash, and PFAS into the Flint River, Sullivan Creek, and Mud Creek without an NPDES permit;

(D) Enter an enforcement order or an injunction under the CWA ordering Defendant Atlanta to cease and abate all violations of the IGP;

(E) Order Defendant Atlanta to pay civil penalties up to $68,445 per day for each day of violation of the CWA set out in this Complaint, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a);

(F) Enter a declaratory judgment that the handling and disposal of PFAS by Atlanta at the Airport may present an imminent and substantial endangerment to health or the environment, pursuant to RCRA, 42 U.S.C. § 6972(a)(1)(B);

(G) Enter an enforcement order or an injunction under RCRA ordering Defendant Atlanta to cease PFAS releases and discharges into the Flint River, Sullivan Creek, and Mud Creek;

(H) Award Plaintiff its costs, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d);

(I) Award Plaintiff its costs, including reasonable attorney and expert witness fees, as authorized by Section 7002(e) of RCRA, 42 U.S.C. § 6972(e); and

(J) Award Plaintiff such other and further relief as this Court deems just and equitable.

Respectfully submitted this 16th day of November, 2026.

**SOUTHERN ENVIRONMENTAL LAW CENTER**

*/s/ April S. Lipscomb*
April S. Lipscomb
G.A. Bar No. 884175
Peter Slag
G.A. Bar No. 393594
William Snow
G.A. Bar No. 022457
10 10th Street, NW
Suite 1050
Atlanta, GA 30309
Phone: 404-521-9900
Fax: 404-521-9909
alipscomb@selc.org
pslag@selc.org
wsnow@selc.org

James S. Whitlock
N.C. Bar No. 34304
*Pro Hac Vice application forthcoming*
48 Patton Avenue, Suite 304
Asheville, NC 28801
Telephone: (828) 258-2023
jwhitlock@selc.org

*Attorneys for Plaintiff Flint Riverkeeper, Inc.*